**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**DANIEL VILLARREAL JR.,**

Plaintiff,

v.

**CITY OF DETROIT;**
**PHILLIP TILLISON;**
**EVAN MALICK;** and
**ALLEN AUSTIN,**

Defendants.

Case No.:

Hon:

---

**Marc J. Mendelson (P52798)**
**Madeline M. Sinkovich (P82846)**
MIKE MORSE LAW FIRM
Attorneys for Plaintiff
24901 Northwestern Highway, Suite 700
Southfield, MI 48075
(248) 350-9050
madeline.sinkovich@855mikewins.com

---

## COMPLAINT AND JURY DEMAND

NOW COMES, Plaintiff, Daniel Villarreal Jr., by and through counsel, the MIKE MORSE LAW FIRM, and for his Complaint against Defendants, alleges as follows:

## PARTIES

1. Plaintiff Daniel Villarreal Jr. is an adult resident of Sterling Heights, Macomb County, Michigan.

2. Defendant City of Detroit is a Michigan municipal corporation that operates the Detroit Police Department ("DPD") and the Detroit Detention Center ("DDC").

3. Defendant Phillip Tillison was, at all relevant times, a DPD officer who personally participated in the events alleged in this Complaint, and is sued in his individual capacity.

4. Defendant Evan Malick was, at all relevant times, a DPD officer who personally participated in the events alleged in this Complaint, and is sued in his individual capacity.

5. Defendant Allen Austin was, at all relevant times, a DPD detective assigned to the 8th Precinct Detective Unit who investigated the fraud matter described below and directed Plaintiff's January 29, 2025 arrest.

6. At all relevant times, the individual Defendants acted under color of state law.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments

to the United States Constitution, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.

8. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

9. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### A. Plaintiff's medical needs

10. On January 29, 2025, Plaintiff had diagnosed nonischemic cardiomyopathy and severe congestive heart failure.

11. His prescribed treatment included cardiac medications and a wearable cardioverter-defibrillator, commonly called a life vest, intended to protect him against a potentially fatal abnormal heart rhythm.

12. Shortly before his arrest, Plaintiff had taken a prescribed diuretic used to treat his heart failure. The medication caused an urgent and frequent need to urinate.

### B. The arrest and the two asserted grounds for custody

13. On January 29, 2025, at approximately 2:00 p.m., Defendants Tillison and Malick, DPD officers, came from the City of Detroit to Plaintiff's home in Sterling Heights, Michigan. Plaintiff voluntarily came outside to speak with them.

14. Tillison told Plaintiff that officers had a Third Circuit Court Family Division warrant for his arrest, attributed to Judge Allen, dated February 24, 2023, and carrying a $5,000 cash bond for contempt and failure to appear.

15. Plaintiff disputed the two-year old warrant and the suggestion that it concerned child support, since Plaintiff does not have any children.

16. Tillison stated that the warrant information matched Plaintiff's name, date of birth, Social Security number, and address.

17. The officers also identified a separate basis for custody: a probable-cause arrest directed by Austin in connection with a fraud investigation.

18. In the recorded exchange, Malick instructed Tillison to put "per Detective Austin PC lock up" on the detention-center form and to add the warrant.

19. Tillison falsely told Plaintiff's neighbor that Plaintiff had ignored an outstanding warrant and needed to "clear" a separate matter with a detective. Neither a valid warrant nor probable cause supported Plaintiff's arrest, and he was released without charges or jail admission. Tillison's statements damaged Plaintiff's reputation and caused humiliation and embarrassment.

20. Tillison and Malick handcuffed Plaintiff and placed him in their police vehicle. Plaintiff was unarmed, was dressed in shorts and socks, and did not consent to his arrest or transportation to Detroit.

**C. Medical equipment, medication access, and vehicle confinement**

21. Plaintiff told Tillison and Malick that he had congestive heart failure, needed his prescribed life vest, and needed his medications. He asked to bring those items with him.

22. Tillison acknowledged Plaintiff's congestive heart failure in speaking with Malick. The officers also discussed the possibility that Plaintiff would need to be taken to a hospital.

23. At Plaintiff's request and with the officers' permission, his neighbor retrieved a bag of medications and other belongings from the home.

24. The Defendant Officers nevertheless refused Plaintiff's request to bring his prescribed life vest.

25. Tillison placed the retrieved medications in the vehicle's trunk. During the ensuing custody, the Defendant Officers did not provide the medication access Plaintiff requested or arrange for medical personnel to determine how his prescribed treatment could safely continue.

26. Tillison told Plaintiff that a hospital visit could prolong his confinement. In a separate conversation with the neighbor, Tillison stated that the 72-hour period he described would not begin until Plaintiff was processed into detention.

27. Over the course of the custodial episode, the Defendant Officers kept Plaintiff restrained in the rear of the police vehicle for a prolonged period, including periods of waiting rather than merely travel between locations.

28. During that confinement, Plaintiff repeatedly told the Defendant Officers that he urgently needed to use a restroom and that his recently taken medication increased his need to urinate.

29. The Defendant Officers continued the vehicle confinement without permitting restroom access despite those requests. Plaintiff was already secured in custody, and no emergency or threatening conduct by Plaintiff required the continued denial.

30. At some point during the prolonged vehicle confinement, Plaintiff involuntarily urinated on himself. The continued restraint and denial of restroom access, combined with the effects of his medication, caused him physical discomfort, humiliation, and distress.

**D. Detention-center refusal, continued custody, and hospital care**

31. Tillison and Malick transported Plaintiff to the Detroit Detention Center (DDC). They remained responsible for his custody when DDC did not accept him.

32. At DDC, booking personnel advised the Defendant Officers that no active warrant for Plaintiff was found and therefore refused his admission to DDC.

33. A medical professional also refused to admit Plaintiff because he lacked his prescribed life vest and necessary medications. This communicated to the Defendant Officers that Plaintiff could not safely be accepted in that condition.

34. Despite the warrant information from booking personnel and the medical refusal, the Defendant Officers continued to restrain Plaintiff and sought to take him to another detention facility.

35. Rather than first obtaining his life vest or arranging an appropriate medical assessment of his ability to remain in custody without it, the Defendant Officers continued his custodial transportation.

36. During this continued custody, one of Defendant Officers instructed Plaintiff not to disclose his serious medical conditions at the next receiving facility where they intended to take Plaintiff.

37. Plaintiff subsequently reported severe chest pain while still in the officers' custody. The Defendant Officers then took him to Detroit Receiving Hospital.

38. Plaintiff arrived at the emergency department in police custody and was handcuffed to a bed. The emergency records document chest pain, tachycardia, stress associated with the arrest, and an extensive cardiac history.

39. The officers released Plaintiff from custody at the hospital.

40. No criminal prosecution was ever instituted against Plaintiff arising from this arrest or the fraud investigation described herein.

**E. The fraud investigation and warrant information**

41. The asserted fraud basis concerned a January 18, 2025 credit-card-skimmer incident at a Save A Lot store at 20811 West 8 Mile Road in Detroit, assigned DPD Case No. 250118-0200. The police records identify Defendant Austin as the investigating detective.

42. The reporting officer stated that he reviewed store video showing a man placing a skimming device on a card reader. The narrative described two Hispanic male suspects, including their clothing, but did not identify Plaintiff by name.

43. The narrative also referred to clear photographs taken at a second Save A Lot location. An evidence entry dated January 21, 2025 identifies a DVD containing video extracted from the first store.

44. The produced suspect records describe the unnamed men as approximately 30 to 40 years old, 5 feet 7 inches to 5 feet 9 inches tall, and 160 to 180 pounds.

45. The same production lists Plaintiff as 51 years old, 5 feet 6 inches tall, and 228 pounds. Although a suspect entry identifies him by name, the disclosed narrative does not explain the identification or the material differences between his

characteristics and the descriptions of the unnamed men, or any other information to show how he was identified as a suspect.

46. The disclosed records do not identify a witness who identified Plaintiff before his arrest or describe a reliable pre-arrest comparison connecting him to the men depicted in the store images.

47. The January 29 arrest report identifies Malick as the arresting officer, lists a fraud offense under Case No. 2501180200, and states: "PC ARREST PER DETECTIVE AUSTIN 8TH PRECINCT PDU." The production redacts the separate warrant narrative and does not include the judicial warrant described at Plaintiff's home.

48. After the arrest, Plaintiff's criminal-defense counsel and civil counsel made inquiries concerning the warrant attributed to Judge Allen. Judge Allen advised counsel that he had not signed the purported warrant described by the Defendant Officers.

49. On information and belief, no valid, active judicial warrant authorized Plaintiff's arrest on January 29, 2025. This allegation is based on the booking information, the inquiries to the purported issuing judge, and the failure to locate the described judicial warrant despite multiple FOIA requests.

50. On information and belief, when Austin directed Plaintiff's arrest, he lacked a reasonably trustworthy identification or other individualized evidence sufficient to establish probable cause that Plaintiff committed the skimmer offense.

51. The disclosed descriptions, their differences from Plaintiff's recorded characteristics, and the absence of an explained pre-arrest identification support that allegation.

52. On January 30, 2025, after Plaintiff's arrest and release, the reporting witness viewed a six-person photographic lineup containing Plaintiff's photograph and selected no one. A statement taken by Defendant Austin that day records that none of the persons looked familiar to the witness. The lineup was not a pre-arrest identification.

53. The body camera and dash camera recordings provided to Plaintiff through FOIA requests do not depict the entire custodial episode. They include only portions of the events at DDC and do not establish the complete duration or circumstances of Plaintiff's vehicle confinement and custodial detention.

**F. Municipal policies, supervision, and custodial practices**

54. Before and on January 29, 2025, the City of Detroit maintained an unwritten practice within DPD's detective-directed arrest process of permitting persons to be arrested and held for investigative questioning on a detective's "PC lockup" designation even when the directing detective lacked reasonably

trustworthy, individualized facts establishing probable cause. Under that practice, the designation itself was treated as authority for custody, rather than a direction dependent on the existence of an actual factual basis for arrest.

55. Plaintiff's arrest was initiated and carried out through that process. DPD Case No. 250118-0200 identifies Austin as the investigating detective and Gregory A. Tomassini as supervisor. Malick instructed Tillison to place Austin's "PC lockup" direction on the detention-center form, and the arrest report stated: "PC ARREST PER DETECTIVE AUSTIN 8TH PRECINCT PDU." Austin's direction supplied the asserted fraud basis for Plaintiff's custody, although he lacked the individualized probable cause alleged herein.

56. Tillison explained that Plaintiff had to speak with a detective and "clear" a separate matter. He also stated that hospital treatment would prolong confinement because "the 72 hours doesn't start until you get in there and get processed." These explanations, together with the officers' instructions for documenting the hold, reflected DPD's existing investigative-hold and processing practices. The officers continued applying that process after DDC personnel reported no active warrant, maintaining Plaintiff's custody on the unsupported detective-directed hold.

57. Separately, the City of Detroit maintained a custodial transportation practice under which officers continued vehicle confinement and sought admission

at another detention facility after medical rejection without first obtaining medical direction or addressing the specific medical needs that prevented admission. That practice permitted efforts to complete booking to proceed while the arrestee remained dependent on the transporting officers for access to necessary prescribed equipment, medication, and medical care.

58. That practice was applied to Plaintiff. Tillison and Malick knew of his severe heart failure, his prescribed life vest, and his requests for medication access. DDC's medical refusal expressly identified the unmet treatment needs preventing safe admission. Nevertheless, both officers maintained custody and sought admission elsewhere without obtaining his life vest or arranging a medical assessment of how his treatment could safely continue. During that continued custody, one officer instructed Plaintiff not to disclose his medical conditions to the next facility. The officers took Plaintiff to the hospital only after he subsequently reported severe chest pain.

59. The City of Detroit's training and supervision were inadequate for the responsibilities assigned to personnel directing arrests and maintaining prebooking custody. The deficiencies concerned: (a) ensuring that detective-directed arrests rested on actual individualized probable cause and reassessing the remaining basis for custody when an asserted warrant could not be confirmed; (b) obtaining and following medical direction when necessary prescribed treatment was unavailable

or a receiving facility rejected admission for medical reasons, including accurately communicating those reasons to subsequent receiving personnel; and (c) providing timely, secure restroom access during prolonged vehicle confinement when an arrestee disclosed an urgent medication-related need.

60. The need for practical training and supervision concerning medically rejected admissions was obvious because rejection left the arrestee in the transporting officers' exclusive custody, without access to the receiving facility's care and unable independently to obtain treatment. The necessary medical response therefore could not be deferred until successful booking. The City of Detroit's policymakers responsible for DPD training and custodial operations nevertheless maintained the deficient training and supervisory arrangements described above, despite the obvious and highly predictable risk that officers would continue medically unsafe confinement rather than obtain appropriate care.

**G. Plaintiff's prior complaint history and the City's responses to records requests**

61. Before the arrest at issue, Plaintiff had publicly criticized DPD officers' conduct toward workers he employed. In October and November 2017, Plaintiff spoke to local news media concerning an encounter in which officers allegedly directed members of his renovation crew to "run or go to jail." The reporting identified Plaintiff by name, quoted his criticism of the officers' racial stereotyping of his workers, and reported that he filed a grievance on their behalf.

62. DPD leadership publicly addressed the same incident. Assistant Chief Arnold Williams acknowledged a policy violation and stated that he had reviewed two body-camera recordings showing the encounter. The police commission's Office of the Chief Investigator ("OCI") opened an investigation into the conduct Plaintiff had publicly challenged.

63. Following Plaintiff's January 29, 2025 arrest, his former counsel requested the complete DPD file concerning Plaintiff and that incident, including reports and recordings. On February 27, 2025, the City denied the request, representing, based on information supplied by DPD personnel, that DPD did not possess any record corresponding to the request.

64. After Plaintiff's present counsel submitted a subsequent request identifying the same arrest and its location, the City advised on May 14, 2025 that DPD had retrieved responsive records and submitted them to the Law Department. On July 23, 2025, the City identified seventeen pages of documents and five video files for production under FOIA No. 25DPD-07845. The production included police records and recordings documenting the arrest for which the City had previously represented that it possessed no responsive records.

65. Plaintiff also filed a citizen complaint concerning his January 29, 2025 arrest and treatment in custody. By letter dated April 25, 2025, OCI Investigator Jureka Johnson confirmed that she had been assigned Plaintiff's complaint,

identified as Case 79660, BPC 25-0351-1, stated that the investigation remained ongoing, and advised that Plaintiff would receive its findings upon completion.

66. On March 9, 2026, in response to Plaintiff's request for investigation records, the City stated under FOIA No. 26DPD-01273 that no responsive Internal Affairs records were located. Plaintiff has received neither the OCI investigation file identified in the April 25, 2025 letter nor the promised findings.

67. Plaintiff also requested the complete OCI and Board of Police Commissioners investigation file concerning the 2017 Ohio Street incident, including the identities and precinct assignments of the six officers, investigative findings, and disciplinary records. On June 5, 2026, under FOIA No. 26DPD-03346, the City reported that a search of DPD databases and Internal Affairs records located no records regarding Plaintiff and separately asserted that the description of the incident was insufficient to locate the requested records. The City produced no investigation file, officer identifications, or findings.

68. The City's responses have not disclosed the disposition of the investigations it acknowledged, the findings concerning Plaintiff's January 29, 2025 arrest and custodial treatment, or the identities and assignments of the officers investigated in connection with the 2017 incident. The records and findings requested by Plaintiff would identify the investigative steps taken, the officials who reviewed the alleged misconduct, and any resulting corrective action.

**H. Injuries and damages**

69. As a result of Defendants' conduct, Plaintiff sustained physical, cardiac, neurological, cognitive, and psychological injuries, including acute chest pain and tachycardia requiring emergency evaluation; aggravation and/or exacerbation of his serious preexisting cardiac condition through deprivation of medically necessary cardiac equipment and medications; right upper-extremity pain, weakness, paresthesia, loss of function, reduced range of motion, rotator cuff dysfunction, and diagnosed right rotator cuff tear/rupture.

70. Plaintiff also sustained memory loss, cognitive inefficiencies, and neurocognitive complaints; post-traumatic stress disorder, anxiety, panic symptoms, hypervigilance, depression, emotional distress, humiliation, and fear of police; urinary urgency/involuntary urination while detained; and related pain, suffering, loss of function, loss of enjoyment of life, medical expenses, therapy, diagnostic imaging, injections, medication management, and future treatment needs.

71. Plaintiff incurred medical and treatment expenses and experienced interference with work and daily activities. He seeks damages for injuries and aggravation of preexisting conditions caused by Defendants' conduct.

72. Plaintiff continues to experience physical and emotional symptoms and seeks compensation for resulting future loss and reasonably necessary care to the extent established by the evidence.

**COUNT I**
**42 U.S.C. § 1983 – FOURTH AMENDMENT**
**UNLAWFUL SEIZURE AND ARREST**
**Against Tillison, Malick, and Austin**

73. Plaintiff incorporates by reference Paragraphs 1 through 72.

74. Austin directed Plaintiff's arrest on the asserted fraud probable-cause basis. Tillison and Malick personally carried out the arrest and asserted both that basis and the purported Family Division warrant.

75. Neither a valid warrant nor probable cause to believe Plaintiff had committed an offense supplied lawful authority for the arrest.

76. Austin directed a custodial arrest to obtain Plaintiff for further investigation even though the facts known to him did not reliably identify Plaintiff as a perpetrator. The directive did not itself supply the missing factual basis for probable cause.

77. By causing or carrying out the arrest under the circumstances alleged, each Defendant violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure. Each Defendant is liable for his own participation and the injuries proximately caused by it.

78. The unlawful arrest caused Plaintiff loss of liberty and the resulting injuries and damages described above.

WHEREFORE, Plaintiff Daniel Villarreal Jr. respectfully requests that judgment be entered in his favor and against Defendants Tillison, Malick, and Austin, jointly and severally, and that this Court award damages in an amount to be determined at trial for the unlawful seizure and arrest of Plaintiff, together with punitive damages against the individual Defendants, reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988, prejudgment and post judgment interest as allowed by law, and such other and further relief as the Court deems just and proper.

## COUNT II
## 42 U.S.C. § 1983 – FOURTH & FOURTEENTH AMENDMENTS
## UNLAWFUL CONTINUED SEIZURE
## Against Tillison and Malick

79. Plaintiff incorporates by reference Paragraphs 1 through 78.

80. Tillison and Malick personally maintained physical custody of Plaintiff during the vehicle confinement, the attempted admission at DDC, and the subsequent transportation.

81. After booking personnel advised that no active warrant was found, the Defendant Officers continued the seizure on the Austin-directed fraud basis, which also lacked probable cause as alleged above.

82. The Defendant Officers continued restraining and transporting Plaintiff rather than ending an unsupported custodial hold. Their authority to maintain custody did not arise merely from a detective's desire to interview him.

83. Alternatively, even if the initial arrest was lawful, the manner of Plaintiff's continued seizure was objectively unreasonable. The Defendant Officers prolonged his vehicle confinement and denied repeated urgent restroom requests after he explained his medication-related need, although he was secured and posed no emergency requiring that denial.

84. The Defendant Officers also continued custodial transportation without first addressing the medical impediments that caused DDC to refuse admission. During the effort to take Plaintiff to another facility, one of Defendant Officers instructed him to conceal those impediments.

85. Plaintiff alleges that the prolonged vehicle confinement and its manner were unreasonable even apart from the absence of probable cause.

86. The unreasonable continued seizure caused additional loss of liberty, physical discomfort, involuntary urination, humiliation, emotional distress, and other resulting damages.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants Tillison and Malick jointly and severally, and that this Court award damages in an amount to be determined at trial for Plaintiff's unlawful continued detention, including damages for loss of liberty, emotional distress, humiliation, and resulting economic and noneconomic harm, together with punitive damages against the individual Defendants, reasonable attorney fees and costs

pursuant to 42 U.S.C. § 1988, prejudgment and post judgment interest as allowed by law, and such other and further relief as the Court deems just and proper.

**COUNT III**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**
**Against Tillison and Malick**

87. Plaintiff incorporates by reference Paragraphs 1 through 86.

88. Plaintiff's diagnosed severe heart failure, prescribed defibrillator and cardiac treatment, and need for medically appropriate handling in custody constituted objectively serious medical needs.

89. Tillison and Malick each had actual notice of those needs from Plaintiff's requests and explanations. Their discussion of heart failure and possible hospital transportation, followed by the medical refusal at DDC, demonstrated awareness of the substantial danger of continuing custody without addressing those needs.

90. Despite that knowledge, each Defendant Officer deliberately continued Plaintiff's custody and transportation without his prescribed life vest and without arranging appropriate medication access or a medical assessment before seeking admission at another facility.

91. The instruction to conceal Plaintiff's medical conditions sought to defeat the medical screening that had prevented his admission at DDC. The officer who gave that instruction acted deliberately, not inadvertently.

92. The Defendant Officers also knowingly continued the prolonged vehicle confinement despite Plaintiff's repeated explanations of his urgent, medication-related restroom need, causing avoidable physical discomfort and humiliation.

93. Each Defendant Officer actually recognized and consciously disregarded a substantial risk of serious harm to Plaintiff. Their conduct was deliberate rather than accidental.

94. Defendant Officers' deliberate indifference caused unnecessary physical distress, delayed medically appropriate care, and the resulting physical and emotional injuries described above.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants Tillison and Malick jointly and severally, and that this Court award damages in an amount to be determined at trial for Defendants' denial of adequate medical care and basic humane treatment, including damages for physical pain and injuries, humiliation, emotional distress, medical expense, and all other resulting harm, together with punitive damages against the individual Defendants, reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988, prejudgment and post judgment interest as allowed by law, and such other and further relief as the Court deems just and proper.

## COUNT IV
## 42 U.S.C. § 1983 – MUNICIPAL LIABILITY (MONELL)
## UNLAWFUL CUSTODY AND DENIAL OF MEDICAL CARE
## Against the City of Detroit

95. Plaintiff incorporates by reference Paragraphs 1 through 94.

96. The City of Detroit is liabile is based on its own preexisting customs and deliberately indifferent failures of training and supervision action that caused the constitutional violations alleged in Counts I through III.

97. The City of Detroit maintained the standing investigative-hold practice described herein, under which a detective's "PC lockup" designation was treated as sufficient authority to arrest and retain a person for questioning despite the absence of actual individualized probable cause. The practice permitted an unsupported detective-directed hold to continue when no valid warrant or other lawful ground authorized the confinement.

98. Independently, the City of Detroit maintained the custodial transportation practice described herein, under which officers continued confinement and sought admission elsewhere after medical rejection without obtaining medical direction or addressing the treatment needs that caused the rejection. The practice operated during prebooking vehicle custody, including the interval after a receiving facility refused admission but before another facility assumed responsibility for the arrestee.

99. The City of Detroit also failed to provide training and supervision adequate for the custodial responsibilities. In particular, its practical preparation of transporting officers was deficient concerning preservation of essential prescribed treatment, obtaining medical direction when such treatment was unavailable, responding to medically rejected admissions, communicating known medical risks to subsequent receiving personnel, and addressing urgent medication-related restroom needs during prolonged vehicle confinement.

100. The City of Detroit's policymakers responsible for DPD training and custodial operations knew that officers would transport medically vulnerable arrestees and retain custody when receiving facilities refused admission. Such arrestees depended on those officers to obtain medical assistance and could not independently retrieve prescribed equipment, obtain medication, or leave to seek care. The City nevertheless continued assigning those responsibilities without adequate practical training and supervisory procedures for responding to the medical needs that prevented admission.

101. The need for that medical-response training was sufficiently obvious, and the constitutional consequences of its inadequacy sufficiently predictable, that the City of Detroit's failure constituted deliberate indifference independently of any pattern of earlier similar violations. Without adequate preparation for obtaining and following medical direction during prebooking custody, transporting officers would

predictably continue confinement without addressing serious medical needs, including needs expressly identified by receiving medical personnel. Plaintiff suffered that very consequence.

102. The City of Detroit's investigative-hold practice was a moving force behind Plaintiff's arrest and continued seizure. Austin used the detective-directed process to cause Plaintiff's arrest for further investigation without the underlying probable cause alleged above. Tillison and Malick treated that direction as continuing authority for confinement after DDC personnel reported no active warrant. The practice thus caused an unsupported investigative hold to be initiated and maintained rather than prevented or terminated.

103. Separately, the City of Detroit's medical-transport practice and deficient training and supervision were moving forces behind the unreasonable manner of Plaintiff's custody and the denial of necessary medical care, even if the initial arrest were otherwise lawful. After DDC identified the unmet treatment needs, the officers continued confinement and pursued another detention placement without first securing the prescribed life vest or appropriate medical direction. These failures prolonged Plaintiff's separation from necessary treatment and delayed appropriate care until he reported severe chest pain. The deficient handling of his prolonged vehicle confinement also caused his disclosed urgent restroom needs to remain unaddressed.

104. The City of Detroit's own customs and deliberately indifferent training and supervisory failures directly and proximately caused Plaintiff's loss of liberty, delayed medical care, avoidable physical distress, involuntary urination, humiliation, and the resulting physical, psychological, and economic injuries described above.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant City of Detroit and that this Court award compensatory damages in an amount to be determined at trial for the injuries proximately caused by the City's policies, customs, practices, and/or failures to train, supervise, and discipline, together with reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988, prejudgment and post judgment interest as allowed by law, and such other and further relief as the Court deems just and proper.

## COUNT V
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT
## 42 U.S.C. § 12131 et seq.
## Against the City of Detroit

105. Plaintiff incorporates by reference Paragraphs 1 through 104.

106. Defendant City of Detroit is a public entity within the meaning of 42 U.S.C. § 12131(1) and is responsible for the administration of the Detroit Police Department's transportation and custodial services.

107. At the time of the events alleged, Plaintiff had severe congestive heart failure and nonischemic cardiomyopathy that substantially limited the operation of

his cardiovascular and circulatory systems. Plaintiff therefore had a disability within the meaning of the ADA.

108. Plaintiff was a qualified individual with a disability under 42 U.S.C. § 12131(2). With reasonable modifications, he met the essential eligibility requirements for access to the City's transportation, custodial, and related services provided to persons held in police custody.

109. This count concerns the failure to provide necessary disability-related modifications after Plaintiff was secured in police custody, including during vehicle confinement and transportation between facilities.

110. Plaintiff informed Tillison and Malick that he had congestive heart failure, required a prescribed wearable cardioverter-defibrillator, commonly called a life vest, and needed access to his prescribed medications. During his vehicle confinement, Plaintiff also repeatedly explained his urgent need to use a restroom and the effect of his recently taken diuretic medication.

111. Plaintiff requested reasonable modifications to ordinary transportation and custodial practices, including:

a. Permitting his existing prescribed life vest to accompany him and allowing its use during custody, subject to reasonable security precautions;

b. Providing medically appropriate access to his prescribed medications, including obtaining medical direction when necessary to permit their safe use during custody; and

c. Providing timely, supervised restroom access during prolonged vehicle confinement in response to his disclosed medication-related urgency.

112. These modifications were necessary to permit Plaintiff meaningful access to the City's custodial and transportation services without disability-related barriers. They would not have required abandoning otherwise lawful custody or compromising legitimate security requirements, and would not have fundamentally altered the nature of those services.

113. The requested modifications were not provided. Tillison and Malick refused to allow Plaintiff to bring his life vest, did not provide the requested medication access during the ensuing custody, and continued his vehicle confinement without permitting restroom access despite his repeated requests.

114. DDC medical personnel refused to admit Plaintiff because he lacked his prescribed life vest and necessary medications. That refusal further informed the arresting Defendant Officers of the need to address those disability-related requirements before continuing his custodial transportation. Nevertheless, they continued his custody and sought admission at another facility without first securing the necessary modifications or appropriate medical assessment.

115. During that continued custody, an arresting Defendant Officer instructed Plaintiff not to disclose his serious medical conditions at the next receiving facility. That instruction interfered with the disclosure and assessment of the disability-related needs for which Plaintiff had requested accommodation.

116. On information and belief, the accommodation failures resulted from the City's own custodial practices described in the factual allegations, including continuing detective-directed vehicle holds and interfacility transportation after medical rejection without an effective procedure for securing necessary disability-related modifications. As applied to Plaintiff, those practices permitted continued confinement and transportation without his prescribed life vest, medically appropriate medication access, or accommodation of his urgent restroom needs.

117. Plaintiff seeks to hold the City liable for its own maintenance and administration of the challenged custodial practices and its deliberately indifferent failure to modify them, not merely because the City employed the officers involved.

118. By failing to make the necessary reasonable modifications, the City denied Plaintiff meaningful access to its custodial and transportation services and subjected him to discrimination by reason of his disability, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(7)(i).

119. The accommodation failures caused Plaintiff to remain separated from his prescribed medical equipment and without the requested medication and

restroom access during continued custody. As a direct and proximate result, Plaintiff suffered physical distress, involuntary urination, resulting injury, medical and treatment expenses, and other compensable losses.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant City of Detroit and that this Court award all relief available under Title II of the Americans with Disabilities Act, including compensatory damages in an amount to be determined at trial, reasonable attorney fees, litigation expenses, and costs pursuant to 42 U.S.C. § 12205, prejudgment and post judgment interest as allowed by law, and such other legal and equitable relief as the Court deems just and proper.

## COUNT VI
## FALSE ARREST / FALSE IMPRISONMENT
## Against Tillison, Malick, and Austin

120. Plaintiff incorporates by reference Paragraphs 1 through 119.

121. Austin intentionally caused Plaintiff's arrest by directing the fraud probable-cause hold. Tillison and Malick intentionally restrained, arrested, and transported Plaintiff.

122. Plaintiff was aware of the restraint and confinement, objected to them, and did not consent.

123. The restraint and confinement lacked lawful authority because neither the asserted warrant nor the asserted fraud basis authorized them.

124. On information and belief, Austin directed the arrest knowing that he lacked a reliable individualized basis to identify Plaintiff as a perpetrator. Tillison and Malick continued the confinement after learning that booking personnel found no active warrant, relying on the unsupported fraud hold.

125. The conduct for which Plaintiff seeks relief was not undertaken in good faith. As to each Defendant's own conduct, it reflected an improper purpose or a willful and wanton disregard of Plaintiff's right to be free from confinement without lawful authority.

126. The false arrest and imprisonment caused Plaintiff loss of liberty, physical and emotional injury, humiliation, and economic loss.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants Tillison, Malick, and Austin, jointly and severally, and that this Court award compensatory damages in an amount to be determined at trial for false arrest and false imprisonment, including damages for loss of liberty, humiliation, embarrassment, emotional distress, mental anguish, and other economic and noneconomic loss, together with exemplary damages as allowed by Michigan law, taxable costs, prejudgment and post judgment interest as allowed by law, and such other and further relief as the Court deems just and proper.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## Against Tillison and Malick

127. Plaintiff incorporates by reference Paragraphs 1 through 126.

128. Tillison and Malick exercised custodial control over Plaintiff while knowing that he had severe heart failure and depended on prescribed medical equipment and treatment.

129. Their deliberate course of conduct included refusing the life vest, maintaining prolonged vehicle confinement despite repeated urgent restroom requests, and continuing custodial transportation after DDC refused medically unsafe admission. One of the Defendant Officers additionally instructed Plaintiff to conceal the very medical conditions that caused that refusal.

130. In light of Plaintiff's known vulnerability and the officers' custodial authority, the alleged conduct was extreme and outrageous. Each Defendant Officer intended severe emotional distress or consciously disregarded the likelihood that his own conduct would cause it, and acted without good faith and with a willful and wanton disregard of Plaintiff's safety and emotional well-being.

131. The conduct caused severe emotional distress, including humiliation and trauma-related symptoms requiring treatment for post-traumatic stress disorder, depression, and anxiety.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants Tillison and Malick jointly and severally, and that this Court award compensatory damages in an amount to be determined at trial for severe emotional distress and related harm, including damages for humiliation, outrage, indignity, mental anguish, psychiatric injury, and all other resulting economic and noneconomic loss, together with exemplary damages as allowed by Michigan law, taxable costs, prejudgment and post judgment interest as allowed by law, and such other and further relief as the Court deems just and proper.

**COUNT VIII**
**GROSS NEGLIGENCE**
**Against Tillison and Malick**

132. Plaintiff incorporates by reference Paragraphs 1 through 131.

133. Tillison and Malick assumed and maintained physical custody of Plaintiff, controlling his movement, access to his prescribed equipment and medications, and ability to obtain medical assistance or use a restroom. Their custodial relationship with Plaintiff imposed a common-law duty to exercise reasonable care for his physical safety and to obtain reasonable assistance for his disclosed medical needs.

134. Plaintiff informed each officer that he had severe heart failure and required his prescribed life vest and medications. Tillison acknowledged Plaintiff's heart failure to Malick and placed the retrieved medications in the vehicle's trunk.

Each officer also received Plaintiff's repeated requests for restroom access and his explanation that his medication caused urgent urination.

135. Both officers retained responsibility for Plaintiff after DDC medical personnel refused admission because he lacked his prescribed life vest and necessary medication access. Despite that additional warning, they continued custodial transportation toward another detention placement without first arranging appropriate medical assistance or addressing the treatment needs that prevented admission.

136. Each officer breached his custodial duty by:

a. Failing to take reasonable steps to permit Plaintiff access to his prescribed life vest or obtain medical direction concerning continued custody without it;

b. Failing to arrange medically appropriate access to Plaintiff's prescribed medications or obtain assistance concerning their necessary use during custody;

c. Failing to obtain timely medical assistance after DDC's refusal identified the unresolved treatment needs; and

d. Failing to arrange timely, supervised restroom access during prolonged vehicle confinement despite Plaintiff's repeated explanation of his medication-related urgency.

137. These failures occurred after repeated notice of Plaintiff's medical needs and, as to the continued transportation, an express medical refusal of admission. Each officer's acts and omissions were so reckless as to demonstrate a substantial lack of concern for whether an injury resulted and constituted gross negligence under MCL 691.1407(2)(c) and (8)(a).

138. Each officer's grossly negligent custodial handling was a factual cause and the proximate cause of the injuries attributable to his conduct. Their failure to arrange timely restroom access directly caused Plaintiff's avoidable physical discomfort and involuntary urination. Their failure to obtain appropriate medical assistance prolonged his physical distress and left his disclosed treatment needs unaddressed during continued custody.

139. As a result, Plaintiff suffered physical pain and discomfort, humiliation, resulting psychological injury, medical and treatment expenses, and other injuries and losses caused or aggravated by these custodial failures.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

MIKE MORSE LAW FIRM,
Attorneys for Plaintiff

Dated: November 17, 2026

*/s/ Madeline M. Sinkovich*
Madeline M. Sinkovich (P82846)
24901 Northwestern Highway, Suite 700
Southfield, Michigan 48075
(248) 350-9050
Madeline.sinkovich@855mikewins.com